

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-19-00146-CV

IN THE INTEREST OF S.B., A CHILD

On Appeal from the 320th District Court
Potter County, Texas
Trial Court No. 91,359-D, Honorable Pamela C. Sirmon, Presiding

November 5, 2019

MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

In this accelerated appeal, appellant, K.F., seeks reversal of the trial court's judgment terminating her parental rights to S.B.[1]  K.F. challenges the lack of notice of the termination hearing, the effectiveness of her counsel, the sufficiency of the evidence to support her constructive abandonment of the child, the sufficiency of the evidence to support her failure to comply with court-ordered services, and the finding that termination is in the best interest of the child.  We affirm the judgment of the trial court.

---

[1]  To protect the privacy of the parties involved, we refer to them by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2018); TEX. R. APP. P. 9.8(b).  The father's parental rights were also terminated in this proceeding.  He does not appeal.

Background

K.F. and her boyfriend, K.B., were living with K.F.'s mother when S.B.[2] was born on February 14, 2018. S.B. was unable to breathe and feed simultaneously and, due to these complications, S.B. remained in the neonatal intensive care unit at Northwest Hospital in Amarillo for fifteen days. While S.B. was hospitalized, the Texas Department of Family and Protective Services became involved after allegations of abuse and neglect by K.F. and K.B.[3] were reported to the Department. The report alleged that K.B. was angry at hospital staff and "acting irrationally" which led to him being escorted out of the hospital.

The Department's investigator conducted several visits to the home that K.F. and K.B. would be sharing with K.B.'s father once S.B. was discharged from the hospital. The home was found to be in a deplorable condition and was deemed unsafe for an infant. Upon entry to the home, the investigator observed cockroaches, molded food, piles of clothes, holes in the walls, and trash everywhere. According to the investigator, the home smelled of rotting meat, cat urine, and human body odor. The home remained in this condition throughout the investigation with little improvement. There were also concerns due to K.B.'s untreated mental health issues and his previous history with the Department which resulted in the removal of K.B.'s child from a previous relationship. As a part of the Department's investigation, drug testing was performed and K.B. tested positive for marijuana. The Department offered Family Based Safety Services to K.F. and K.B., if K.F. would move into a shelter with S.B. while K.B. worked services. K.F. refused to

---

[2] S.B. is K.F.'s second child. K.F.'s older child lives with his father in Pittsburg, Texas.

[3] The Department initially believed that K.B. was the father of S.B.

separate herself from K.B. and there were no other placement possibilities available. After determining that S.B. would be at serious risk for substantial harm because of the mental and emotional functioning of K.B., the inability of K.F. to temporarily separate from K.B., and the physical condition of the home, the Department obtained an order of emergency protection of S.B. and removed the child from K.F.'s care.

Shortly after S.B. was removed, the Department was contacted by D.B.,[4] who claimed to be S.B.'s father. After genetic testing, an order was entered adjudicating D.B. the father of S.B.

Following an adversary hearing, the Department was appointed temporary managing conservator and S.B. was placed in a foster home pending the approval of a home study on D.B.'s parents. The court named K.F. as a possessory conservator and ordered her to comply with a service plan developed by the Department.

The Department developed a service plan for K.F. and, because she was continuing her relationship with K.B., the Department also developed a service plan for K.B. The caseworker reviewed the service plan with K.F., who signed the plan. The court-ordered service plan set out several tasks and services for K.F. to complete before reunification with S.B. could occur. These tasks and services included the following: complete a psychological evaluation and follow recommendations; pay child support of $50 per month; maintain regular contact with her caseworker; abstain from the use of illegal drugs; submit to random drug screens; locate and maintain stable housing that is

---

[4] K.F. lived with D.B. in Arkansas for three months after their divorce in 2017 because K.F. was homeless and unable to seek custody of her three-year-old son. K.F. moved back to Amarillo to live with her mother in August of 2017.

free from drugs and violence; locate and maintain stable employment; complete a psychosocial assessment and follow recommendations; attend individual counseling; take parenting classes; participate in rational behavior therapy (RBT); and participate in an assessment at Texas Panhandle Centers (TPC) and follow recommendations. The family service plan also informed K.F. that its purpose was to assist her in providing a safe environment for S.B. The plan warned K.F that if she was "unwilling or unable to provide [S.B.] with a safe environment, [her] parental . . . rights may be restricted or terminated or [S.B.] may not be returned to you."

The trial court conducted a status hearing on April 19, 2018, attended by K.F. and her counsel. Following the hearing, the trial court signed a status hearing order, approving and incorporating by reference the Department's family service plan and making the service plan an order of the trial court. In the order, the trial court found that K.F. had reviewed the service plan, understood it, and signed it.

The associate judge held permanency hearings on August 23 and December 6, 2018. K.F. attended each of these hearings. The associate judge signed orders following each hearing in which the court found that K.F. had "not demonstrated adequate and appropriate compliance with the service plan."

K.F. completed her psychosocial evaluation and, beginning in May, she attended six sessions of individual counseling with Jennifer Voigt, a licensed professional counselor. According to Voigt, K.F. acknowledged that the home she shared with K.B. was not clean and that it might not be suitable for a child. K.F. also acknowledged that K.B. had anger outbursts in the past, but denied that he would be a danger to S.B. K.F.

4

questioned the accuracy of K.B.'s positive drug tests, stating that there was no reason that K.B. should test positive for marijuana because he was not using drugs.[5]  K.F. held several different jobs throughout the sessions and, toward the end of counseling, she obtained an apartment with K.B. and her mother.  The last session that Voigt had with K.F. was in October.  Voigt opined that K.F. had knowledge of appropriate parenting skills and that K.F. was able to explain how she would use the skills in parenting S.B.  While K.F. made progress in counseling, Voigt expressed concern that K.F. would not place the safety of S.B. over her relationship with K.B.  K.F. did not see the point of RBT and K.F. was unable to give any example of any tools that she learned from taking the course.  Based on her experience with K.F., Voigt did not believe that K.F. was able to effectively parent S.B.

K.F.'s caseworker testified that K.F. scheduled a psychological evaluation two times, but that she failed to show for the evaluation.  Also, K.F. did not schedule a mental health evaluation at TPC or participate in parenting classes.  The last contact that the caseworker had with K.F. was at a home visit on December 20.  According to the caseworker, K.F. maintained sporadic contact with her.  The caseworker did not have a current phone number for K.F. at the time of trial.  K.F. submitted to three random drug tests and these tests were all negative.

In November, K.F. and K.B. moved into an apartment with K.F.'s mother.  In December, the caseworker visited the home.  The conditions of that home were a serious concern due to trash on the floor, animal feces throughout the home, and the strong smell

---

[5]  K.B. tested positive for marijuana in April, August, and December.

of cigarette smoke and marijuana. K.F. knew a week in advance that the caseworker was coming for a home visit and she and K.B. were still cleaning whenever the caseworker arrived. The caseworker could tell that "they cleaned up some of the mess, but there was still three or four piles of dog feces on the floor." The kitchen counters were cluttered with dishes and the cookware was coated with food that had obviously "been there for a long time." The condition of the floor was particularly concerning to the caseworker. K.B.'s use of marijuana in the home also presents a safety issue for S.B.

According to K.F., the reason that the Department was involved with S.B. was due to a complaint that K.B. was smoking marijuana at the hospital after S.B. was born. As far as K.F. knows, K.B. does not smoke marijuana although she is aware that he has tested positive for marijuana. K.F. was unaware that her apartment smells like marijuana. K.F. stated that the Department was also concerned that she and K.B. were living with K.B.'s father because he has a drinking problem and the home was a mess. That is why K.F. and K.B. moved to an apartment in August. K.F. acknowledged that K.B. took an anger control training class and goes to TPC for mental health help, but "he's never really gotten angry with me." K.F. believed that K.B. was also participating in services with the Amarillo Council on Alcoholism and Drug Abuse (ACADA), but the caseworker testified that K.B. was not participating in ACADA services.

K.F. worked at Pizza Hut, "off and on," from October of 2017 until S.B. was born in February of 2018. After S.B. was born, K.F. worked at Sonic for approximately three months, and then she was employed at Retail Grocery Inventory Services from June to December. She worked at Waffle House in December and January. While working at

6

Waffle House, she also worked at Sanex for about a month. On February 28, she began working at McDonald's.

K.F. completed her assessment with TPC before her last hearing in December, although the Department did not receive confirmation. K.F. said TPC referred her to Family Support Services for more counseling. According to K.F., she had an appointment for counseling but she had to reschedule "because when she gave me the appointment time, she told me two different appointment times, and I ended up at the wrong one." K.F. completed RBT in June of 2018, but she said that she did not complete her parenting classes, "because CareNet has the parenting classes every Tuesday night from 6:00 to 8:00. I don't have a car. I don't have a way to get home from the parenting classes at 8:00 at night." K.F. asked her caseworker about other options for parenting classes and "she said the only thing they could do is give me bus vouchers." K.F. acknowledged receiving four bus vouchers in December, but she used those vouchers so that she and K.B. could take drug tests that were requested in December. As far as maintaining regular contact with her caseworker, K.F. says she has not done that "[b]ecause she will not answer my phone calls." K.F. completed her psychological evaluation on February 20. She originally scheduled the evaluation for September 11, but she missed that appointment because of a death in the family. K.F. stated that she tried to let her caseworker know that she was having trouble rescheduling the appointment, but she "would not answer my phone calls."

The last time that K.F. visited S.B. was in August, before S.B. was placed with her paternal grandparents in Arkansas. K.F. said that she has asked her caseworker "multiple times" about making arrangements to visit S.B., stating, "I do not have a vehicle.

7

I cannot get to Arkansas." K.F. has attempted to contact the paternal grandparents, but claims they will not answer her calls. K.F. says she has a bassinet, playpen, changing table, and clothes for S.B. K.F. was not aware that the paternal grandparents want to adopt S.B.

K.F. has attempted to call her caseworker "at least once a week" but she has only been able to get ahold of her three times. The last time the caseworker visited K.F.'s home was in October. The last time the caseworker spoke with K.F. was December 6, after the court hearing. If K.B. is "handling his stuff, and going to counseling like he needs to, and taking his medications like he needs to, and working through his issues," K.F. does not see a problem with continuing to be with him. If S.B. were returned to K.F., K.F. and her mother would work opposite shifts so that K.F. could take care of S.B. when K.F. was home. K.F. also has a friend who could babysit for her.

S.B. was placed in the home of her paternal grandparents in Arkansas after their home study was approved. Contrary to K.F.'s assertions, K.F. has not contacted the paternal grandparents to visit S.B. since S.B. was placed with them, but K.F. visited S.B. before she was moved to Arkansas. K.F. has not sent any cards, letters, or gifts to S.B. and she has not asked for assistance with transportation to visit S.B. S.B. is doing "[r]eally well" in her placement. The paternal grandparents are willing to be a long-term placement for S.B. and they are willing to adopt her if parental rights are terminated. The paternal grandparents also have another child of the father's placed in their home. The caseworker testified that it is in S.B.'s best interest that K.F.'s parental rights be terminated because K.F. has made limited progress, she has failed to complete her services, she continues to choose the relationship with K.B. over her relationship with

8

S.B., she minimizes K.B.'s drug use, and the condition of the home. S.B.'s continued placement with her paternal grandparents ensures permanency for S.B.

On February 21, 2019, the associate judge held a final hearing concerning termination of K.F.'s parental rights to S.B. K.F. did not appear. K.F.'s attorney requested a continuance, which was denied by the associate judge. After testimony, the associate judge terminated K.F.'s parental rights on the grounds set forth in Texas Family Code section 161.001(b)(1)(N) and (O), and found that termination would be in S.B.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2018).[6] The court appointed the Department as the managing conservator of S.B.

K.F. timely filed a request for a de novo hearing before the referring court. The district court held a de novo hearing and K.F. testified. By letter ruling, the district court affirmed the termination of K.F.'s parental rights and signed an order of termination.

On appeal, K.F. raises five issues challenging the trial court's order of termination of her parental rights.

## Standard of Review

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the

---

[6] Further references to provisions of the Texas Family Code will be by reference to "section__" or "§ __."

factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *In re K.M.L.,* 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient and we must reverse. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Applicable Law

Involuntary termination of parental rights is a serious proceeding implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). A parent's right to the "companionship, care, custody, and management" of his or her child

10

is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick,* 685 S.W.2d at 20. However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1993)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interest. *In re T.G.R.-M.*, 404 S.W.3d 7, 12 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

In a case to terminate parental rights by the Department under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2019); *In re J.F.C.,* 96 S.W.3d at 264. Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.,* 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the

11

child's best interest." *In re A.V.,* 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.,* 280 S.W.3d at 894-95.

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.,* 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ.). The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.,* 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ.).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). Even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, as long as those determinations are not themselves unreasonable. *Id.*

Analysis

Due Process Issue

In her first issue, K.F. contends that she was denied due process because she did not receive notice of the final hearing held on February 21 before the associate judge. The Department responds that K.F. did not preserve this issue for appellate review.

The record shows that K.F. appeared for the permanency hearing on December 6 and that the order from the permanency hearing scheduled a final trial on the merits for March 21, 2019. An order resetting the final hearing to February 21 was filed on December 18. When the associate judge called the case for final hearing on February 21, K.F. was not present. K.F.'s attorney orally requested a continuance. After the judge denied the continuance, K.F.'s attorney advised the judge that he sent notice of the final hearing to K.F.'s last known address.

Immediately following the hearing before the associate judge, K.F.'s attorney filed a request for de novo hearing. The referring court held a de novo hearing on March 29, 2019, at which K.F. testified. Consequently, the record shows that K.F. was afforded her due process rights when she appeared and was heard at the de novo hearing. *See Adams v. Am. Quarter Horse Assoc.*, 583 S.W.2d 828,834 (Tex. App.—Amarillo 1979, writ ref'd n.r.e.) ("The essential elements of due process . . . are notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case."). Since K.F. was able to testify and present witnesses at the de novo hearing, we conclude K.F. was not deprived of due process on these facts. We overrule K.F.'s first issue.

Ineffective Assistance of Counsel Claim

In her second issue, K.F. asserts that her trial counsel was ineffective because he asked no questions, made no objections, made no argument, and failed to point out that the only order setting final hearing was for a different date than the date of trial.[7] K.F. argues that her counsel's representation did not simply consist of errors or poor trial strategy, but it was so blatantly deficient that she was denied any meaningful assistance and prejudice should be presumed.

In Texas, there is a statutory right to counsel for indigent persons in parental-rights termination cases, and this right encompasses the right to effective counsel. § 107.013(a)(1) (West 2019); *In re M.S.,* 115 S.W.3d at 544. The standard of review to apply in evaluating claims of ineffective assistance of counsel in termination of parental rights cases is the same as that set forth by the United States Supreme Court for criminal cases in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Under the well-established *Strickland* test, proving ineffective assistance of counsel requires a showing that (1) counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which 'requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006) (quoting *In re M.S.*, 115 S.W.3d at 545).

---

[7] This Court ordered the parties to supplement the record to include the record from the de novo hearing and subsequently directed the parties to address the de novo hearing in supplemental briefing. In K.F.'s supplemental brief, she does not complain about her trial counsel's conduct during the de novo hearing. The de novo hearing was requested by K.F.'s trial counsel and, at it, her counsel cross-examined witnesses and made a closing argument.

To determine whether representation was deficient, we much consider all of the circumstances surrounding the case and determine whether counsel was "reasonably effective." *In re M.S.*, 115 S.W.3d at 545. In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440-41 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *In re M.S.*, 115 S.W.3d at 549-50.

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 622-23 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions. *P.W. v. Tex. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 476 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd).

In considering the record from the hearing before the associate judge and the supplemental record from the de novo hearing before the district court judge, the record does not support K.F.'s contention that her trial counsel was ineffective. The record contains an order dated December 18, 2018, rescheduling the final hearing from March 21 to February 21. K.F.'s counsel requested a continuance of the February 21 trial

because of K.F.'s absence and promptly requested a de novo hearing. A de novo hearing occurred on March 29. At that hearing, K.F.'s counsel questioned witnesses and made a closing argument. There is nothing in the record before us showing that counsel's trial strategy was unreasonable. Without an explanation from trial counsel for his actions, we may not, in the face of the strong presumption in favor of reasonable representation, conclude that trial counsel lacked sound strategic reasons for his conduct. *See In re M.S.*, 115 S.W.3d at 549. As to the second prong of the *Strickland* test, K.F. has not attempted to show how any of the actions she claims her trial counsel should have taken would have resulted in a different outcome.

Thus, we conclude that K.F. has failed to show that her trial counsel was deficient or that he prejudiced her defense. We overrule appellant's issue two.

Failure to Comply with Court-Ordered Service Plan Under § 161.001(b)(1)(O)

In her third and fourth issue, K.F. challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights under section 161.001(b)(1)(N) and (O). Only one statutory ground is required to support termination. *See In re A.V.*, 113 S.W.3d at 362. We limit our analysis to the issues raised in issue four concerning the existence of a court-ordered service plan.

A trial court may terminate parental rights based on section 161.001(b)(1)(O) if the Department establishes by clear and convincing evidence that the child was removed under chapter 262 because of abuse or neglect, the Department has been the permanent or temporary managing conservator for at least nine months, a court order specifically established the actions necessary for the parent to obtain the return of the child, and the

16

parent failed to comply with that order. § 161.001(b)(1)(O); *In re J.F.C.*, 96 S.W.3d at 278-79. The Supreme Court has broadened the "abuse or neglect" elements to include risks or threats of the environment in which the child is placed. *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). In 2017, the Legislature amended section 161.001 and added subsection (d), which provides that termination under subsection (b)(1)(O) is disallowed if the parent proves, by a preponderance of the evidence, that the parent was unable to comply with the specific provisions of the court order, and made a good faith effort to comply but was unsuccessful through no fault of the parent. § 161.001(d). However, in the absence of proof under subsection (d), we cannot consider "substantial compliance" with a court-ordered family service plan to be the same as completion. *In re C.R.,* No. 07-19-00009-CV, 2019 Tex. App. LEXIS 3082, at *9 (Tex. App.—Amarillo Apr. 16, 2019, no pet.) (mem. op.).

This Court has held that, to support a termination order based on section 161.001(b)(1)(O), there must be a court order rather than simply a Department-generated service plan. *In re B.L.R.P.*, 269 S.W.3d 707, 710-711 (Tex. App.—Amarillo 2008, no pet.). *See also In re Z.B. & Z.B.*, No. 07-16-00026-CV, 2016 Tex. App. LEXIS 7420, at *13 (Tex. App.—Amarillo July 12, 2016, no pet.) (mem. op.) (holding that failure of the appellate record to contain a court order establishing the actions necessary for a parent to obtain the return of his child defeats a termination order based on subsection (O)). A family service plan that is signed by a parent alone does not satisfy the court-order requirement of the statute until it has been specifically incorporated into a subsequently signed court order. *In re C.R.,* 2019 Tex. App. LEXIS 3082, at *14-15.

Section 161.001(b)(1)(O) makes clear that an order must be sufficiently specific to warrant termination of parental rights for failure to comply with it. *In re N.G.*, 577 S.W.3d 230, 238 (Tex. 2019) (per curiam). On appeal, a court must consider whether the order, and the service plan, if it was incorporated into the order, was sufficiently specific. *Id.* A trial court order referenced by section 161.001(b)(1)(O) that establishes the actions necessary for the parent to obtain return of a child in the Department's custody is sufficiently specific when the terms for compliance are set forth with certainty so that the parent knows what duties and obligations have been imposed. *Id.* at 238.

In issue four, K.F. challenges the existence of a court order that is sufficiently specific to inform her what she must do to obtain the return of S.B.[8] K.F. does not dispute that S.B. was removed for abuse or neglect, that S.B. was in the Department's care for at least nine months, or that K.F. failed to comply with an order of the court. We conclude that the family service plan was court ordered and sufficiently specific to support termination.

The record reflects that the family service plan was court ordered. In this case, the temporary order filed on March 29, 2018, ordered K.F.'s compliance "with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." K.F. signed her family plan of service on April 4, and the plan was

---

[8] K.F. did not expressly raise an issue under section 161.001(d), which provides exceptions to termination of parental rights under section 161.001(b)(1)(O). *See* TEX. FAM. CODE ANN. § 161.001(d). As such, we do not address section 161.001(d) in our analysis of this issue.

We note, however, that K.F. contends that she was unable to attend court-ordered parenting classes due to lack of transportation. The Department provided her with bus vouchers specifically to resolve her transportation issue. However, K.F. chose to use these bus vouchers for another purpose. Therefore, we conclude that K.F. was not unable and did not make a good faith effort to comply with the court order. *See id.*

18

filed with the court the next day. There is no record evidence to indicate that K.F.'s plan of service was changed or modified.

K.F. and her attorney attended the status hearing on April 19, and the court made the following findings in its status hearing order:

> 2.1 The Court, having reviewed the pleadings, and considered all evidence and information required by law, including all service plans and court reports filed by the Department . . . .
>
> 2.4 The Court, having reviewed the service plans filed by the Department, find, except as specifically noted below, that the service plans are reasonable, accurate, and in compliance with the previous orders of the Court.
>
> 2.8 The Court finds that [K.F.] has reviewed and understands the service plan and has been advised that unless she is willing and able to provide the child with a safe environment, even with the assistance of a service plan, with the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or to termination or the child may not be returned to her.
>
> 2.9 The Court finds that [K.F.] has signed the plan.
>
> 5.1 **IT IS ORDERED** that, except as specifically modified by this order or any subsequent order, the plan of service for the parents, filed with the Court or attached to this order and incorporated herein by reference as if the same were copied verbatim in this order, is **APPROVED** and made an **ORDER** of this Court.
>
> 5.2 **IT IS ORDERED** that the plan of service issued by this Court shall continue in full force and effect subject to the following modifications:
>
> "None."

The status hearing order adopted K.F.'s filed service plan and "incorporated it by reference" specifically making it an order of the court. At the final hearing, the status hearing order and the service plan were admitted into evidence as exhibits. The service plan is the only service plan in the record for K.F. Consequently, we conclude that the record establishes that the family service plan in this case was court ordered.

19

In addition to establishing that the family service plan was court ordered, the record also reflects that the family service plan was sufficiently specific to support termination. The family service plan incorporated into the trial court's order in April 2018, specifically stated the actions and responsibilities that are necessary to achieve the plan goal during the period of the service plan. Regarding those tasks, the caseworker testified that K.F. completed some of these services, including RBT, a psychosocial evaluation, drug testing, and individual counseling, but she did not complete parenting classes, or maintain stable housing or employment.

As to parenting classes, the plan provided:

Parenting Classes

[K.F.] will actively participate in and complete parenting classes. [K.F.] will participate in a class that teaches parenting skills which are appropriate for the ages of her children. [K.F.] will be responsible for attending two one-day classes if she does not take a ten week class. [K.F.] will exhibit proper parenting skills in all of her interactions with her child. [K.F.] will be responsible for any payments regarding her classes.

Parenting classes are offered at the following agencies:

1) CareNet Pregnancy Center, 6709 Woodward, Amarillo, TX 79106. Call (806) 354-2288 for class information on class.

2) Family Support Services, 1001 S. Polk Amarillo, TX 79101. Call (806) 342-2530 for information on classes.

3) Texas Panhandle Centers, 1500 S. Taylor, Amarillo, TX. Call (806) 359-2005 for information on classes.

During her testimony, K.F. did not assert that the order was vague or that she did not know where to go or who to call to schedule parenting classes. K.F. stated that she had not participated in parenting classes, "because CareNet has the parenting classes every Tuesday night from 6:00 to 8:00. I don't have a car. I don't have a way to get home from the parenting classes at 8:00 at night." K.F. asked her caseworker about other

20

options for parenting classes and "she said the only thing they could do is give me bus vouchers." K.F. acknowledged receiving four bus vouchers in December, but instead of using the vouchers for parenting, she used those vouchers so that she and K.B. could submit to drug testing requested by the Department.

As to housing and employment, the plan provided:

Housing & Employment

[K.F.] will locate and maintain stable housing that has working utilities and is free from drugs and violence. [K.F.] will remove or lock up anything in the home that poses a risk of harm to her child. [K.F.] will establish daily routines and schedules, and learn to live a less chaotic lifestyle. [K.F.] will allow announced and unannounced home visits to her home.

[K.F.] will locate and maintain stable and appropriate employment that provides a stable source of legal income adequate enough to support herself and her child for a minimum of six (6) months to demonstrate stability. [K.F.] will provide employment verification to her caseworker, and will provide copies of pay stubs on a monthly basis.

The plan does not define stable or appropriate except to say that K.F. was to live in a home with working utilities that is free from drugs, violence, or any hazards, and she was to hold a job for six months with proof of income.

The testimony was disputed as to when K.F. and K.B. moved from his father's home and the month of the caseworker's visit to the apartment that K.F. and K.B. shared with K.F.'s mother. The condition of the apartment was also disputed in that K.F. claimed not to be aware of the smell of marijuana noted by the caseworker. K.F. did not refute the caseworker's report of three or four piles of dog feces on the floor, which posed a hazard for an infant who was beginning to crawl. The testimony also showed that K.F. worked at five different jobs during the twelve months that the plan of service was in effect.

There was also testimony that K.F. completed other services under the plan such as RBT, drug testing, and several sessions of individual counseling, and that she scheduled and rescheduled her psychological evaluation and counseling sessions, which indicates that the family service plan was sufficiently specific to put K.F. on notice as to what tasks she was required to complete.

We conclude that the plan of service was sufficiently specific to inform K.F. of the duties and obligations required.

Here, as the trier of fact, the trial court resolved credibility issues and conflicts in the evidence against K.F. We conclude the trial court was presented with clear and convincing evidence sufficient to support a finding that K.F. failed to comply with specific, itemized tasks contained within a court order required to obtain the return of her child. *See In re N.G.*, 577 S.W.3d at 238. As such, K.F.'s fourth issue is overruled.

Best Interest of the Child

In her fifth issue, K.F. challenges the legal and factual sufficiency of the evidence supporting the best interest finding made under section 161.001(b)(2). A determination of best interest necessitates a focus on the child, not the parent. *See In re B.C.S.,* 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.). Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.,* 402 S.W.3d at 250. There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006).

In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex.

22

1976).  These factors include:  (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent.  *Id.*  "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'"  *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)).  Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest.  *See In re E.C.R.*, 402 S.W.3d at 249.  The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence.  *In re N.R.T.,* 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).  We must also bear in mind that a child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in determining best interest.  *See In re K.C.,* 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

*The desires of the child*

At the time of trial, S.B. was thirteen months old and was non-verbal. As such, the record is silent regarding S.B.'s desires. However, the evidence showed that she had spent all but fifteen days of her life in a foster home or relative placement. Certainly, the lack of contact between K.F. and S.B. in the seven months prior to trial supports a conclusion that there is no emotional bond between them. Given the vulnerable age of S.B., this evidence weighs in favor of the trial court's best interest determination. *See In re J.M.T.*, 519 S.W.3d 258, 271 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

*The emotional and physical needs of and danger to the child*

The next two factors are the child's emotional and physical needs now and in the future, and the emotional and physical danger to the child now and in the future. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ). A parent's inability or unwillingness to provide adequate care for her child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interest. *In re C.A.J.,* 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.).

At thirteen months of age, S.B. requires constant emotional and physical support. *In re A.K.*, 487 S.W.3d 679, 688 (Tex. App.—San Antonio 2016, no pet.). She is dependent solely on a caregiver for her needs and protection, and these needs for emotional and physical support will continue for many years. *Id.* K.F. continued her relationship with K.B. knowing that her parental rights were in jeopardy and planned to

continue living with K.B. K.B. did not complete his plan of service and his consistent use of marijuana and his untreated mental health issues posed a risk to S.B.'s safety and stability. K.F. dismissed concerns expressed by the Department about K.B.'s continued use of marijuana and his propensity for angry outbursts. The physical condition of K.F.'s and K.B.'s home changed very little during the Department's involvement. K.F.'s unwillingness or inability to maintain a drug-free home, and continued relationship with K.B. suggests that similar conduct will occur in the future, thereby constituting evidence of emotional and physical danger to the child now and in the future. *In re D.L.N.,* 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied). The trial court could have concluded that K.F. is unable to meet the physical or emotional needs of S.B. and is unable to protect S.B. from physical or emotional danger. These two factors weigh heavily in favor of the trial court's best interest determination.

*Parenting ability and programs available to assist party seeking custody*

The fourth and fifth factors will be discussed together. In reviewing the parenting ability of the parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the child. *In re G.N.,* 510 S.W.3d 134, 139 (Tex. App.—El Paso 2016, no pet.). "A parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of a child." *In re S.B.,* 207 S.W.3d 877, 888 (Tex. App—Fort Worth 2006, no pet.). The factfinder can infer from a parent's failure to take the initiative to avail herself of the programs offered to her by the Department that the parent "did not have the ability to motivate herself to seek out available resources needed now or in the future." *In re J.M.,* No. 01-14-00826-CV, 2015 Tex. App. LEXIS 2130, at *21 (Tex. App.—Houston

[1st Dist.] Mar. 5, 2015, no pet.) (mem. op.) (citing *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.)).

While K.F. completed some of her court-ordered services, she failed to demonstrate real progress from those services and make the necessary changes in her life that would positively impact S.B. K.F. did not see the point of RBT and she was unable to give any example of any tools that she learned from taking the course. K.F. continued to live in an unsafe home environment despite the Department's intervention and changing residences. K.F. was unwavering in her pursuit of a relationship with K.B. in spite of his consistently testing positive for marijuana, and his refusal to participate in a substance abuse assessment and a drug treatment program.

K.F.'s failure to complete these necessary services could have led the trial court to infer that K.F. did not have the ability to motivate herself to seek out available resources now or in the future. *See id.* at *21-22. The trial court was entitled to find that this evidence weighed in favor of the best interest finding.

*Plans for the child and stability of the home or placement*

We will consider the sixth and seventh factors together. The sixth factor examines the plans for the child by those individuals or the agency seeking custody. The seventh factor is the stability of the home or proposed placement. Stability and permanence are paramount in the upbringing of children*. In re J.D.,* 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The factfinder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *Id.* at 119-20.

K.F. obtained an apartment so that S.B. could come home and she has acquired a bassinet, playpen, changing table, and clothes for S.B. K.F. has the ability to get a crib if she needs one. K.F. plans to let her mother keep S.B. when K.F. is working, and then K.F. can care for S.B. while her mother works. K.F. plans to continue her relationship with K.B. regardless of whether S.B. is returned to her care. K.F.'s inability to demonstrate stability is further evidenced by her frequent job changes, and her failing to establish a safe, stable, and drug-free home environment suitable for a thirteen-month-old child.

The Department was seeking permanence for S.B. S.B. has lived with her paternal grandparents since August of 2018 and she is doing "really well" in their home. S.B.'s half-sibling is also placed in the home. The paternal grandparents wish to adopt S.B., which would provide permanency and stability for S.B. If adopted, S.B. would receive post-adoption benefits.

This evidence supports the trial court finding that termination was in the best interest of the child.

*Acts and omissions of the parent*

The eighth factor is the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. Despite K.B.'s many positive drug tests, K.F. continued to assert that K.B. did not use marijuana and questioned the accuracy of his positive tests. K.F. was aware from the time that S.B. was taken into care by the Department that her parental rights were in jeopardy and that she was required to complete services offered by the Department in order to be reunited with S.B. Here, although the evidence showed that K.F. completed some of the plan's requirements, the

evidence showed that K.F. did not comply with the portion of her plan designed to address the reasons S.B. was taken into care, including: K.F.'s failure to maintain stable housing that is free from drugs, locate and maintain stable employment for a minimum of six months to demonstrate stability, maintain regular contact with her caseworker regarding her participation and progress in services, participate in and complete parenting classes, and complete a TPC assessment within sixty days of receiving the plan.

In considering this evidence, the trial court could have found that the existing parent-child relationship is not a proper one.

We conclude that the evidence is both legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of K.F.'s parental rights is in the best interest of S.B. Issue five is overruled.

Conclusion

The judgment of the trial court terminating K.F.'s parental rights is affirmed.


Judy C. Parker
Justice